## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## GREENBELT DIVISION

| | |
|---|---|
| **EILEEN M. HYLIND** | * |
| | * |
| **Plaintiff** | * |
| | * |
| v. | * |
| | *    **Civil No.: PJM 03-116** |
| **XEROX CORPORATION** | * |
| | * |
| **Defendant** | * |
| | * |
| | * |

## OPINION

### I. Introduction

Eileen Hylind won a jury verdict against Xerox Corporation on claims of sexual
discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended, and
the jury awarded her compensatory damages, subsequently capped at the statutory maximum of
$300,000. The Court now addresses various post-trial motions of the parties.

Hylind has filed:

> 1) A Motion for Economic Damages, claiming entitlement to back pay and front
> pay, arguing that she sustained disabling migraine headaches and became
> unable to work as a result of Xerox's actionable behavior;
>
> 2) A Motion for Injunctive Relief, seeking to prevent Xerox from retaliating
> against her and others who helped her during her case, and to require Xerox to
> take company-wide steps to prevent potential future situations of sexual
> discrimination and retaliation; and

1

3) A variety of post-trial motions asking the Court to reconsider its past decisions,
to add new claims, to grant sanctions against Xerox, and to provide various
other types of relief.

Xerox has filed:

1) A Motion to Strike certain exhibits contained in Hylind's post-trial request to
add new claims.

The Court has considered the parties' briefs and has heard oral arguments as to the first
two motions. The Court decides the other motions on the papers, finding a further hearing
unnecessary. Local Rule 105.6 (D. Md.).

For the reasons that follow, Hylind's Motion for Economic Damages is **GRANTED IN
PART AND DENIED IN PART**. Her Motion for Injunctive Relief is **DENIED**. All of her other
motions are **DENIED**. Xerox's Motion to Strike is rendered **MOOT**.

## II. Case History

The Court set out the facts and history of this case in its Order of August 18, 2008 [Paper
No. 341], when it addressed a previous set of post-trial motions. That factual recitation remains
operative, and to the extent additional factual or procedural matters are relevant, the Court will
refer to them in the course of this Opinion.

## III. Plaintiff's Motion for Economic Damages

As a general rule, back pay is awarded to successful Title VII plaintiffs. *Albemarle Paper
Co. v. Moody*, 422 U.S. 405, 421-22 (1975). This furthers the objectives of Congress in enacting
Title VII to create incentives for employers to provide equality of employment opportunities and

to make persons whole for injuries suffered on account of unlawful discrimination. *Id.* at 418-19. An award of back pay ensures that victims of unlawful employment practices are "restored to a position where they would have been were it not for the unlawful discrimination." *Id.* at 421. "To make the plaintiff whole, the award of back pay should be the difference between what the employee would have earned had the wrongful conduct not occurred from the period of termination to judgment, and the actual earnings during that period." *Ford v. Rigidply Rafters, Inc.*, 984 F. Supp. 386, 389 (D. Md. 1997). District courts have broad equitable discretion in determining the award. *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763-64 (1976).

With these objectives in mind, the Court calculates back pay in this case guided by four considerations: 1) the time period for which the back pay should be awarded, 2) the appropriate salary and fringe benefit rates for that period, 3) whether Xerox is entitled to an offset for amounts paid to Hylind as disability pay, and 4) the appropriate rates of pre-judgment and post-judgment interest.

## A. Time Period of Back Pay Award

Both parties accept that Xerox's conduct contributed to Hylind sustaining disabling migraine headaches in 1995 and affected her ability to work, such that she is clearly entitled to some amount of back pay. They dispute, however, the length of time for which Xerox's conduct contributed to her disability, and thus differ as to the appropriate period for which she should be awarded the back pay. Hylind contends that Xerox's conduct left her permanently disabled and unable to work, such that she is entitled to back pay from the time she stopped working at Xerox, i.e., 1995, through judgment in 2007, as well as front pay for the rest of her working life. Xerox

3

submits that Hylind returned to her pre-incident ability to work by 1999, and that that year should be the cutoff date for any back pay.

As an initial matter, Hylind argues that the Court is obliged to give greater weight to the testimony of her treating physician over that of other medical experts in evaluating her medical condition, which is to say that the Court should give more credit to the testimony of her expert and treating physician, Dr. Blake, than to that of Xerox's expert, Dr. Ammerman. While it is true that testimony by treating physicians may be accorded greater weight in Social Security disability benefits cases, *see* 20 C.F.R. § 416.927(d)(2), this rule does not automatically transfer to other areas of the law where not mandated by statute or regulation. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (rejecting application of "treating physician rule" in ERISA cases since not required by statute or relevant regulations). The treating physician rule is not mandated either under the language of Title VII nor under any relevant regulations, nor does there appear to be any Fourth Circuit caselaw mandating application of the rule in Title VII cases. In fact, the Fourth Circuit has declined to give dispositive weight to the conclusions of treating doctors in other contexts. *See Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 504 (4th Cir. 2001) (determining in FMLA case that District Court was not bound to follow plaintiff's treating psychiatrist's opinion). The Court, therefore, declines to apply a rule according greater weight to the treating physician's testimony and will instead weigh the testimony of Hylind's and Xerox's medical experts based on the same factors that ordinarily affect the credibility and reliability of expert medical witnesses.

Reviewing the testimony of both Dr. Blake and Dr. Ammerman, the Court concludes that the period of disability attributable to Xerox's actionable conduct in this case, and thus the period

4

of back pay, should be 8 years. In determining this number, the Court credits testimony from both sides' experts.[1]

The Court finds Dr. Ammerman credible in his testimony that, based upon his experience, Hylind's disabling migraines would not last for the rest of her life, but that she would eventually return to her pre-1995 baseline level of work capability.[2] *See* Ammerman Test. (June 19, 2007) 148:2-150:9. Dr. Ammerman did not give a specific year by which he believed that Hylind would be back at her pre-1995 baseline, opining instead that she had begun to improve by 1999 and that her period of disability would definitely be less than 13 years, the extraordinarily long time it took for the case to come to trial in 2007, and certainly less than the remainder of her lifetime. *See id.*

Dr. Blake's testimony also bears on the appropriate length of the period of back pay. Dr. Blake testified that, in her capacity as Hylind's physician, she cleared Hylind to work part-time for up to 20 hours per week in 1999. *See* Blake Test. (June 12, 2007) 48:5-:20, 88:16-:22. The Court finds the determination that Hylind could begin working up to 20 hours per week in 1999 credible since it reflected Dr. Blake's pre-litigation observations of Hylind made in a treatment context. This evidence also reflects, however, that Hylind's migraines, though exacerbated by Xerox's actions, were capable of improvement. The Court finds this testimony at odds with

---

[1] Hylind has asked that the Court strike Dr. Ammerman's opinion on the grounds that it was not properly disclosed and is unreliable. Hylind made these same objections at trial and the Court overruled them. The Court reaffirms its rulings at this time.

[2] In speaking of Hylind's pre-1995 baseline, the Court is referring to the level of work she was capable of performing prior to 1995, which was affected by Xerox's actionable conduct at or about that time (i.e., conduct which occurred within the statute of limitations and for which Xerox was found liable by the jury). This does not necessarily mean that Hylind would be migraine-free or symptom-free after returning to this baseline. *See* Hylind Test. (June 14, 2007) 133:14-134:14 (discussing how she suffered from migraines prior to 1995). Likewise, it does not mean that Hylind might not still have migraines or symptoms of disability based upon causes outside the scope of this case (including the alleged acts of Xerox employees that occurred outside the statute of limitations), or that she might not be considered disabled under some other standard of medical review, such as that used by the disability plan.

5

Hylind's contention that Xerox's conduct has left her permanently disabled. Finding that Hylind was steadily improving 4 years after the events sued upon in this case, the Court, in its discretion, considers 8 years to be the appropriate duration of the disability to attribute to Xerox's actionable conduct. Accordingly, the Court will award Hylind back pay for the years of 1995 to 2002.[3] Since the only pay due that the Court attributes to Xerox's actionable conduct ends in 2002, there is no occasion to make a front pay award.

## B. Salary and Fringe Benefits

Hylind believes that the Court should calculate its award of base salary based upon promotions she feels she would have received and sales goals she feels she would have met if the incidents in this case had not happened and she had continued working. Her numbers are based in large part upon projections by her vocational expert and in part on earnings data of other Xerox employees.[4] The Court finds the promotion and sales goal scenarios suggested by Hylind much too speculative in nature. Additionally, these scenarios would result in base salaries far in excess of those that Hylind was actually receiving prior to and up through 1995, before Xerox's actionable conduct. The Court has decided that the appropriate base salary for measuring Hylind's back pay should be the average of the salaries she actually received in the four years preceding her discontinuance of work in 1995, with increases to reflect reasonable expected

---

[3] Since Hylind became disabled and stopped working in or about June 1995, the 8-year period would technically run from June 1995 through May 2003. For the sake of simplicity in calculating back pay over this 8-year period, the Court will treat the back pay period as if it began in the beginning of 1995 and ran through the end of 2002. Thus, no offset will be taken for any regular earnings received for the period of January through May 1995, and no additional compensation will be included for the period of January through May 2003.

[4] Hylind alleges that Xerox withheld certain discovery related to other employees' earnings. Xerox disputes this. Even if such information had been available, and even if it contained the information Hylind claims it would have, the information would not alter the Court's decision to calculate Hylind's base salary based on her own prior earnings history.

salary increases over the relevant 8-year period. Hylind's actual past salaries, which reflect her actual performance capability as of the time of Xerox's inappropriate conduct, offer a better indicator of the pay that was lost by reason of Xerox's conduct.

Thus:

Based upon her W-2 forms, Hylind's annual earnings from 1991 through 1994 were $100,565, $56,670, $58,541, and $68,866, respectively. Using a 3% annual rate of increase, the Court converts these salaries into 1995 dollars, making the respective adjusted salaries $113,187, $61,925, $62,106, and $70,932. These salaries average out to a 1995 base salary of $77,037. For each of the 8 years subsequent to 1995, the Court will increase this base salary by 3% to account for inflation and wage growth.[5]

As for lost benefits, the Court will add to each year's base salary a percentage of that base salary representing employer contributions to Hylind's 401(k) and her cash balance retirement account. For the 401(k), the contribution rate was 3% per year from 1995 to 2002. For the cash balance retirement account, the contribution was 5% per year from 1995 to 2002. Combined, these two percentages result in additional yearly benefits of 8% of salary.

---

[5] Based on the Bureau of Labor Statistics Consumer Price Index, which tracks inflation, the average annual rate of inflation for the period relevant to this case rounds out to 3%. *See* U.S. Dep't of Labor, Bureau of Labor Statistics, Consumer Price Index from 1913 to Present, *available at* ftp://ftp.bls.gov/pub/special.requests/cpi/cpiai.txt. Likewise, per the Bureau of Labor Statistics Employment Cost Index, the average annual rate of increase in wages and salaries for private industry sales workers over the relevant period also rounds out to 3%. *See* U.S. Dep't of Labor, Bureau of Labor Statistics, Employment Cost Index Archived News Releases, *available at* http://www.bls.gov/schedule/archives/eci_nr.htm. Thus, a 3% rate would serve as a reasonable means of adjusting Hylind's annual salary estimates to account for inflation and wage growth over time. Accordingly, the Court adjusts Hylind's compensation upward at a rate of 3% annually over the relevant period. In declining to further increase Hylind's compensation estimates to account for merit-based increases above the rate of inflation and average wage growth, the Court notes that Hylind will also receive, as described *infra*, pre-judgment interest, through judgment, for all back pay awarded over the relevant period.

## C. Whether Xerox Is Entitled to an Offset for Disability Payments to Hylind

Xerox argues that it is entitled to an offset against the back pay award for payments

Hylind received under Xerox's disability plan, while Hylind argues that these payments were

from a collateral source and therefore should not be offset against the back pay award. The Court

concludes that these payments ultimately came from Xerox, not from a collateral source, and

therefore should be offset against the back pay award.

The "collateral source rule" provides that "when the victim of a tort receives payment for

his injuries from a collateral source, that is, a source independent of the tortfeasor, the payment

should not be deducted from the damages owed by the tortfeasor." *Ward v. Allied Van Lines,*

*Inc.*, 231 F.3d 135, 139 (4th Cir. 2000). Collateral funds are "those received from a source

distinct from the employer." *Szedlock v. Tenet*, 61 Fed. App'x 88, 93 (4th Cir. 2003). In light of

the "make-whole" purpose of the back pay award, "[i]f an employer's payment would not have

been made had the employee continued working, it exceeds the damages necessary to make the

plaintiff whole, and failure to offset it would necessarily lead to a windfall." *Fariss v. Lynchburg*

*Foundry*, 769 F.2d 958, 966 (4th Cir. 1985). "Otherwise, plaintiff would enjoy the rewards from

the employer both of working and not working." *Id.* at 967.

Hylind has requested that the Court employ the five-part *Allen* test, which weighs various

factors,[6] to determine whether the disability payments should be considered a collateral source.

While some district courts in this Circuit have applied the *Allen* test in evaluating collateral

source issues, *see, e.g., Calef v. FedEx Ground Package System, Inc.*, 2007 WL 2570185, at *2

---

[6] The test considers: (1) whether the employee made any contribution to the funding of the disability payment; (2) whether the benefit plan arose as the result of collective bargaining activity; (3) whether the plan and payments thereunder cover both work-related and non-work-related injuries; (4) whether payments from the plan are contingent upon length of service of the employee; and (5) whether the plan contains any specific language contemplating a set-off of benefits received under the plan against a judgment recovered in a tort action. *Allen v. Exxon Shipping Co.*, 639 F. Supp. 1545, 1548 (D. Me. 1986).

(N.D. W. Va. Aug. 31, 2007); *Reed v. E.I. Du Pont de Nemours and Co.*, 109 F. Supp. 2d 459, 467 (S.D. W. Va. 2000), they did so in the context of deciding issues under state law. In the context of deciding collateral source issues under federal law, the Fourth Circuit was asked to apply the *Allen* test in *Szedlock* but did not do so. 61 Fed. App'x at 94. This Court also declines to apply the *Allen* test here.[7]

The evidence on this issue suggests that the disability payments received by Hylind came from Xerox. The disability plan was a benefit she received as an employee of Xerox, and she herself admitted that Xerox was the payor of the disability benefits, as reflected in her annual earnings statements. *See* Hylind Test. (June 14, 2007) 136:2-138:11. Beyond Hylind's suggestion that insurance companies provided the benefits—a suggestion that, even if true, would not necessarily require a finding that the funds came from a collateral source[8]—she provides no relevant documentation or other evidence in support of that proposition. Under the circumstances, with the record providing no concrete evidence that the funds came from a source

_____

[7] The Court also notes that, even if it were to apply the *Allen* test here, there is no evidence in the record that would permit the Court to balance the test's five factors. Xerox notes that Hylind's wage statements from Xerox show disability payments, but refers to no other documentation relating to the upstream source(s) of those funds. Hylind counters that she has "always believed that insurance companies . . . provided the funds," but refers to no documentation or testimony in the record supportive of that conclusion. In the absence of any additional information in the record regarding the source(s) of the disability payments, their precise purpose(s), or the details of their calculation and administration, the Court would have no means of applying the *Allen* factors to the facts of this case.

[8] The caselaw is not clear on the question of whether the collateral source rule bars offsets against back pay awards for disability or other insurance benefits where the employer is both the benefit provider (or premium payor) *and* the wrongdoer. *Compare Flowers v. Komatsu Mining Sys., Inc.*, 165 F.3d 554, 558 (7th Cir. 1999) (noting that, "[i]n an employment case, if the employer is the source of the funds at issue, then the payments can be deducted from the award," and asserting that, at least in age discrimination cases, it is within the district court's discretion to set off—or not set off—disability insurance payments), *with Phillips v. Western Co. of N. Am.*, 953 F.2d 923, 931-34 (5th Cir. 1992) (noting that, "where the tortfeasor contributes toward the benefit, . . . the justifications for denying a setoff become less compelling," but nevertheless suggesting that a setoff may not be appropriate where the employer's payments into an insurance fund were *not* made for the purpose of insuring against legal liability). In any event, the Court again notes that the only available evidence suggests that the benefits at issue were paid by Xerox. Beyond Hylind's mere assertion that she has "always believed that insurance companies . . . provided the funds," the record in this case contains no evidence that the funds came from some other source, nor does it provide any evidence with regard to the purpose(s) of the funds, how they were calculated, or how they were distributed or administered.

9

other than Xerox, the Court cannot conclude that the payments were received from a source "independent" or "distinct" from Xerox, that is, that they came from a collateral source. Hylind received these payments because she could not work and she would not have received them if she had continued working. Failure to acknowledge an offset would give her the benefit "both of working and not working," an unfair windfall for her and an unfair penalty for Xerox. Accordingly, for each year as to which back pay is awarded, Hylind's award of salary and benefits will be reduced by the amount of disability pay she received in that year.[9]

Hylind's annual disability payments were $34,819 ($2,901.55 per month). *See* Hylind Test. (Aug. 28, 2007) 88:21-:23; 100:19-101:3. While the take-home amount she received has fluctuated in some years due to various unrelated deduction or additions, the amount representing her disability pay has remained constant at $34,819. The Court will therefore use that amount as the offset amount.[10]

The Court notes that Hylind has received disability pay up through the present, i.e., through September 2010. Although the Court has decided to offset the disability payments for the years 1995 to 2002—the back pay period—the Court will not offset any disability payments made after the back pay period, i.e., after 2002. As the Court emphasizes in footnote 2, *supra*, the determination of the back pay period is based solely upon the wrongful conduct at issue in this case and the applicable legal standards for back pay awards in Title VII cases. Emphatically, this does not mean that Hylind has not been and is not currently disabled due to causes outside the

---

[9] The parties have suggested that it may be appropriate to adjust the offset to include premiums or contributions paid in order to fund the disability benefits. The Court finds no evidence in the record as to the specific amounts, if any, either party paid in premiums or contributions, and the Court makes no further adjustment in this regard.

[10] As indicated in footnote 3, *supra*, the 8-year back pay period for which Hylind received disability pay technically started in June 1995, when she became disabled, and ran to May 2003. As with the base salary calculation, for the sake of simplicity in calculating the disability offset over the 8-year period, the Court will treat the back pay period as if it began in the beginning of 1995 and ran through the end of 2002.

10

scope of this case, such as alleged conduct by Xerox employees which occurred outside the
statute of limitations, the preexisting nature and extent of Hylind's migraine headaches, or other
harmful stressors which were not at issue in, or are not part of the record in, this case. Hylind
may also be deemed disabled pursuant to some other metric of medical review, such as that
established by the disability plan. The disability payments which were made during the years of
the back pay period have been deducted from the back pay award since, for that period and that
period only, the Court has determined that Hylind's disability was caused by Xerox's actionable
conduct. The Court considers the disability payments made during that period as essentially
advance payments on the back pay award, and they are being deducted so that Hylind does not
inappropriately receive a double recovery for that period. At the same time, since the disability
payments made to her after the back pay period may be attributable to causes outside of the legal
and factual scope of this case, they are arguably payments Hylind would have received
regardless of whether Xerox had committed the actionable wrongs at issue here.

## D. Rate of Pre-judgment Interest

Pre-judgment interest is a matter within the court's discretion, taking into account the
"make-whole" policy of Title VII. *Maksymchuk v. Frank*, 987 F.2d 1072, 1077 (4th Cir. 1993)
(quoting *Albemarle*, 422 U.S. at 421). While not bound by state law, the court may choose to
apply the interest rate provided for by state law. *See Quesinberry v. Life. Ins. Co. of N. Am.*, 987
F.2d 1017, 1031 (4th Cir. 1993) (upholding application of Virginia pre-judgment interest rate);
*E.E.O.C. v. Liggett & Myers Inc.*, 690 F.2d 1072, 1074 (4th Cir. 1982) (upholding application of
North Carolina pre-judgment interest rate). The legal rate of interest in Maryland is 6% per
annum, Md. Const. art. III, § 57, which reflects the lost time-value of money in this State. Hylind

has lost the time-value of considerable sums of money. The Court will therefore apply a 6% per annum rate for pre-judgment interest in this case.[11]

In light of the "make-whole" purpose of Title VII, the Court will also compound the interest annually instead of awarding simple interest. "Common sense and the equities dictate an award of compound interest." *Cooper v. Paychex, Inc.*, 960 F. Supp. 966, 975 (E.D. Va. 1997) (Title VII case where court applied state pre-judgment interest rate but compounded interest to reflect fact that "an award of interest on interest, i.e., compound interest, is necessary to make [plaintiff] whole"), *aff'd*, 163 F.3d 598, 1998 WL 637274 (4th Cir. 1998) (table decision). But for Xerox's conduct, Hylind would have had access to this money during the back pay period and would have been able to earn interest not only on the principal amounts, but also on accumulated interest. Compounding the interest reflects this economic reality and reasonably furthers the goal of placing Hylind in the position where she would otherwise have been.

Unlike pre-judgment interest, which is left to the Court's discretion, post-judgment interest is governed by statute, *see* 28 U.S.C. § 1961; *Quesinberry*, 987 F.2d at 1031. Therefore, to the extent that any post-judgment interest may be due, it will be governed by the statutory rate.

### E. Calculation of the Back Pay Award

Based on the above determinations, the Court calculates Hylind's back pay award as follows:[12]

---

[11] The Court declines to suspend the award of pre-judgment interest for the period that this matter was proceeding before administrative agencies. While that process took an inordinate amount of time, and while Hylind may have been able to request a right-to-sue letter earlier than she did, the Court will not penalize her for allowing the administrative proceedings to run their full course.

[12] For a more detailed presentation of the Court's back pay award calculation, see attached Exhibit A, Detailed Back Pay Award Calculation.

12

| Year | Base Salary (Adjusted 3% Annually) | Compensation (Base Salary + 8% Benefits) | Compensation Offset by Disability Pay (-$34,819 / Year) | Offset Compensation + 6% Pre-judgment Interest Compounded Annually Through Judgment (Sept. 2010) |
|-------|------------|------------|------------|------------|
| 1995 | $77,037 | $83,200 | $48,381 | $115,949 |
| 1996 | $79,349 | $85,696 | $50,877 | $115,029 |
| 1997 | $81,729 | $88,267 | $53,448 | $114,001 |
| 1998 | $84,181 | $90,915 | $56,096 | $112,877 |
| 1999 | $86,706 | $93,643 | $58,824 | $111,665 |
| 2000 | $89,308 | $96,452 | $61,633 | $110,376 |
| 2001 | $91,987 | $99,346 | $64,527 | $109,016 |
| 2002 | $94,746 | $102,326 | $67,507 | $107,596 |
| Total | | | | $896,509 |

The Court, then, awards Hylind $896,509 in back pay and will enter judgment in that amount in her favor with respect to economic damages.[13]


## IV. Plaintiff's Motion for Injunctive Relief

Hylind seeks two types of injunctive relief. First, she seeks to enjoin Xerox from retaliating against her or any other Xerox employees (current or former) who testified on her behalf or otherwise supported her case. Second, she wants the Court to order Xerox to take company-wide steps to prevent situations like hers from occurring in the future. These steps would include: giving employees written "receipts" whenever they engage in protected activity; informing company employees about the receipt policy; notifying employees of the statute of limitations of potential legal claims they might have; encouraging employees who are not given receipts to file charges with the EEOC or some other appropriate administrative agency; allowing employees who engage in protected activities with respect to their managers to change managers; appointing an ombudsman to oversee discrimination policies; establishing a "hotline"

---

[13] This will, of course, be in addition to the $300,000 awarded as compensatory damages.

13

for employees to make complaints of discrimination; keeping discrimination-related matters confidential and sanctioning employees who "gossip" about such matters; giving employees the option of receiving "no-fault severance packages" when discrimination matters become "too sensational;" and changing the language Xerox uses regarding how it handles complaints.

The Court declines to issue injunctive relief.

The Court understands it has certain discretion in this matter. "If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate." 42 U.S.C. § 2000e-5(g)(1). "Injunctive relief is a matter left to the discretion of a trial court," though the trial court must "exercise its discretion in light of the prophylactic purposes of the Act to ensure that discrimination does not recur." *Spencer v. General Elec. Co.*, 894 F.2d 651, 660 (4th Cir. 1990). Injunctive relief is most appropriate "[i]n cases presenting abundant evidence of consistent past discrimination." *See Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1561 (11th Cir. 1986). Conversely, injunctive relief is least appropriate where there is "no indication that defendants have indulged in any similar discrimination in the past, or that they are likely to do so in the future," such as in a case which "appears to represent an isolated incident." *See E.E.O.C. v. Financial Assurance, Inc.*, 624 F. Supp. 686, 695 (W.D. Mo. 1985).

As to Hylind's request for an injunction preventing Xerox from retaliating against Hylind or those who helped her in this case, Title VII already prevents employers from retaliating against individuals who pursue or assist others in pursuing discrimination claims. 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice

14

made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."). This protection extends not just to current employees, but also to former employees. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997). Absent evidence suggesting that Xerox intends to retaliate against Hylind or those who assisted her by participating in the suit, a further layer of protection in the form of an injunction is not necessary. *See Does 1-7 v. Round Rock Indep. Sch. Dist.*, 540 F. Supp. 2d 735, 745-46 (W.D. Tex. 2007) (declining to grant an injunction which "would be nothing more than an injunction to 'follow the law'" where it was unclear whether unlawful conduct would reoccur).

Hylind has suggested that Xerox can still retaliate against her by cutting off her disability benefits and that any decision to change or terminate her disability payments must be construed as retaliation. The Court, however, declines to rewrite the provisions of the disability plan or to dictate how it is to be administered. As indicated in footnote 2, *supra*, the Court makes no determination as to Hylind's continued eligibility for disability payments and leaves that determination to the plan administrator or other appropriate decisional authority in light of the terms and conditions of the plan, Hylind's medical status, applicable law, and any other relevant factors. Apart from this, again, Hylind remains protected against retaliation by both 42 U.S.C. § 2000e-3(a), as well as applicable provisions of the Employee Retirement Income Security Act of 1974, Pub. L. 93-406, 88 Stat. 829. As with Hylind's general concern regarding retaliation, absent evidence indicating that Xerox will unlawfully cancel her disability coverage once the case is over, adding an injunction on top of the other available protections already in place is unnecessary.[14] *See Round Rock*, 540 F. Supp. 2d at 745-46.

---

[14] In support of her claim that Xerox may retaliate against her through her disability benefits, Hylind relates an incident from 2004 when Xerox sent her a form letter erroneously telling her that she was eligible for Medicare

15

As for Hylind's request for an injunction requiring Xerox to set new company-wide policies and procedures for handling discrimination cases, the Court finds such global injunctive relief inappropriate. This was not a "pattern or practice" suit brought under 42 U.S.C. § 2000e-6, and the suit did not address sex discrimination concerns at a company-wide level. Rather, the case focused on Hylind's singular experience. Wholesale injunctive relief might have been appropriate in a "pattern or practice" case or a class action with broad evidence shedding light upon company-wide conduct, if indeed there was any suggestion that Xerox had been engaged in widespread unlawful conduct. The unlawful conduct in the present case, however, was directed at only one individual, and it occurred over 15 years ago in a limited timeframe (early 1995) in a limited geographic area (suburban Maryland), and was committed by at most a few of Xerox's managers. In other words, this suit is not an appropriate vehicle for the type of broad injunction Hylind seeks. *See Spencer*, 894 F.2d at 660 (stating that "[t]his is not a case of systematic company-wide discrimination, but rather this case presents an isolated incident of one supervisor run amok" and declining to grant injunctive relief); *Brown v. Trs. of Boston Univ.*, 891 F.2d 337, 361 (1st Cir. 1989) (vacating as too broad injunction applying to all faculty members of school when plaintiff's case only "established that she alone had been the victim of sex discrimination").

To be sure, the Court recognizes that one of the purposes of Title VII is to prevent conduct such as that suffered by Hylind from occurring in the future. *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 546 (1999) (noting "Title VII's objective of motivating employers to detect

---

benefits and that her disability payments would be offset by the Medicare benefits she would receive. It appears that when Hylind informed Xerox that she was not in fact eligible for Medicare, her disability pay was not reduced. Hylind says this was not simply an accident or a clerical error but was an intentional attempt to retaliate against and harass her. Aside from the fact that this "evidence" is outside the record, since the matter was resolved in Hylind's favor after the error was pointed out and her benefits were not reduced, Xerox appears well able to comply with its legal obligations.

and deter Title VII violations") (quotation marks and brackets omitted). But that deterrence will certainly flow from the magnitude of the jury verdict and the Court's decision in this case. Hylind has been awarded $300,000 in compensatory damages and $896,509 in back pay, and Xerox now faces the further prospect of attorney's fees. Though not as direct as an injunction, substantial awards such as these unquestionably motivate companies to ensure that their employment practices conform with the law, lest they face similar judgments in the future. *See Albemarle*, 442 U.S. at 417-18 (discussing how monetary judgments can provide "the spur or catalyst which causes employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history") (quoting *United States v. N.L. Indus., Inc.*, 479 F.2d 354, 379 (8th Cir. 1973)).

## V. Plaintiff's Other Motions

Hylind has filed miscellaneous additional motions, including: Motion for the Court to Take Notice of New Legislation [Paper No. 353], Motion for the Court to Take Judicial Notice of New Supreme Court Decision [Paper No. 372], and Motion for Sanctions [Paper No. 363]. The first two seek various forms of relief, including permission for Hylind to amend her Complaint to add new claims, permission to reopen discovery and evidence, reconsideration of various prior decisions of the Court, and judgments notwithstanding the verdict (JNOVs) with respect to the claims for which the jury found in favor of Xerox and against Hylind. The final motion seeks sanctions against Xerox for alleged discovery violations. All these motions lack merit and may be denied with minimal discussion.

Hylind's first miscellaneous motion is based on the Lilly Ledbetter Fair Pay Act of 2009, 42 U.S.C. § 2000e-5(e)(3). That law altered the statute of limitations for filing claims of compensation discrimination. The present case, however, is not about compensation discrimination. Hylind's initial Complaint contained four counts: 1) hostile work environment sexual harassment; 2) quid pro quo sexual harassment; 3) retaliation; and 4) sex discrimination. There was no count for compensation discrimination. In any case, to the extent that Hylind suggests she may have been discriminated against in her pay, she never was able to flesh out such a claim in a timely fashion and none of the Court's prior decisions addressed the interplay between discriminatory compensation claims and the statute of limitations. The Court finds no reason to amend any of its previous decisions in light of the Lilly Ledbetter Fair Pay Act. Insofar as Hylind suggests the Act affects evidentiary matters, the Act deals only with the specific issue of the time for filing a compensation discrimination claim. It does not change or expand the rules of evidence, nor does it pertain to other types of claims. Finally, to the extent Hylind seeks leave to amend her Complaint to add new compensation discrimination claims, that request is denied. It is far too late to begin anew a case that began in this Court in January 2003 and is now at the post-trial stage. To quote the Court's Opinion of August 18, 2008 [Paper No. 340], which denied Hylind's previous post-trial motion to add claims, "[t]his case is over and will not be re-tried based on additional causes of action." Op. at 8. "This case has been fully litigated and is ready for closure." *Id.*[15]

In her second miscellaneous motion, Hylind contends that the Supreme Court's decision in *Gross v. FBL Financial Services*, 129 S. Ct. 2343 (2009), renders improper one of the jury instructions given by the Court. Specifically, she claims the Court should not have given a

---

[15] Xerox has filed a Motion to Strike [Paper No. 362] some of the exhibits attached to Hylind's motion discussing the Ledbetter Act. Since the Court is denying Hylind's motion, Xerox's Motion to Strike is **MOOT**.

18

"pretext" instruction to the jury (requiring it to find that Hylind's gender was the determinative or but-for reason for Xerox's negative employment action or actions), but, instead, should have given the jury a "mixed-motive" instruction (which would have allowed the jury to find that the negative employment action was based on a mix of lawful and unlawful reasons, but which also would have provided Xerox a defense to the effect that it would have taken the same action against Hylind even if the discriminatory factors had not been present). In *Gross*, the Supreme Court determined that a mixed-motive instruction is not appropriate in an Age Discrimination in Employment Act ("ADEA") case. *Id.* at 2350. But, since this is a Title VII case, not an ADEA case, the Court finds that *Gross* in no way affects the Court's decision to give a pretext instruction in this case. In Title VII cases, a plaintiff may proceed under either a pretext theory or a mixed-motive theory. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 317-18 (4th. Cir. 2005) (holding that the contention that "all employment discrimination cases should be analyzed as mixed-motive cases" is "meritless"); *Watson v. Se. Penn. Trans. Auth.*, 207 F.3d 207, 220 (3d Cir. 2000) (determining that both standards are viable and distinct ways of evaluating Title VII discrimination cases). Indeed, the Court gave Hylind a choice as to which theory she wished to proceed under, and she made the tactical decision to proceed under a pretext theory instead of a mixed-motive theory, presumably because the evidence appeared to justify it, and further because it denied Xerox the defense that it would have taken the same action against Hylind even without the discriminatory influence. Trial Tr. (June 25, 2007) 30:11-36:8 (charge conference discussing pretext and mixed-motive instructions). That this tactical decision may have resulted in findings for Xerox on certain counts does not constitute error requiring the Court to set aside the jury's verdict.

In her Motion for Sanctions, Hyland claims Xerox committed various discovery violations over the life of the case. Many of these claims appear to have been previously raised and rejected. *See* September 30, 2004 Order [Paper No. 115]; December 5, 2006 Order [Paper No. 200]. They are rejected here again. To the extent this motion raises new claims, they are denied as untimely. *See Brandt v. Vulcan, Inc.*, 30 F.3d 752, 756 (7th Cir. 1994) (noting that while sanctions rule "does not establish any time limits within which a motion for sanctions must be filed, . . . unreasonable delay may render such a motion untimely," and denying post-trial motion for sanctions based on discovery violations); *Mercy v. County of Suffolk, New York*, 748 F.2d 52, 56 (2d Cir.1984) (holding that a "motion for Rule 37 sanctions should be promptly made, thereby allowing the judge to rule on the matter when it is still fresh in his mind," and that "the motion should normally be deemed waived if it is not made prior to trial").

## VI. Conclusion

Summing up:

Plaintiff's Motion for Economic Damages [Paper No. 298] is **GRANTED IN PART** and she is awarded $896,509 in back pay, allowing for compensation increases and interest, but setting off disability payments she received. An Order of Judgment will be entered in Hylind's favor and against Xerox in that amount, augmented by the award of $300,000 in compensatory damages, for a total of $1,196,509. The Motion for Economic Damages is **DENIED** in all other respects. Plaintiff's Motion for Injunctive Relief [Paper No. 297] is **DENIED**. Plaintiff's Motion for the Court to Take Notice of New Legislation [Paper No. 353] is **DENIED**. Plaintiff's Motion for the Court to Take Judicial Notice of New Supreme Court Decision [Paper No. 372] is

**DENIED**. Plaintiff's Motion for Sanctions [Paper No. 363] is **DENIED**. Defendant's Motion to Strike [Paper No. 362] is **MOOT**.

The Court will entertain a motion from Hylind's former attorney for attorney's fees, to be filed as expeditiously as possible.[16]

A separate Order will **ISSUE**.

/s/
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**September 17, 2010**

---

[16] The Court emphasizes that it is Hylind's former attorney, Laurence S. Kaye, Esquire, who may file a motion for attorney's fees, not Hylind herself. *Pro se* plaintiffs are not entitled to recover attorney's fees for work they undertake on their own cases, and they are not otherwise entitled to compensation for the work they themselves perform *pro se*. *See, e.g., Hawkins v. 1115 Legal Service Care*, 163 F.3d 684, 694-95 (2d Cir. 1998).