IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **EILEEN M. HYLIND** | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Civil No. **PJM 03-116** |
| | * | |
| **XEROX CORPORATION** | * | |
| | * | |
| Defendant. | * | |

## MEMORANDUM OPINION

### I.

### Introduction

Eileen M. Hylind sued Xerox Corporation for sexual discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Following a jury trial, she was awarded compensatory damages, subsequently capped by the Court at the statutory maximum of $300,000, and $896,509 in economic damages (back pay). The Court offset payments Hylind received pursuant to Xerox's disability plan from the back pay award.

Both parties appealed to the Fourth Circuit. The case returns to this Court on remand from the Fourth Circuit to determine a narrow issue: To what extent should payments by Xerox to Hylind under its disability plan be set off against her back pay award in this, a sexual discrimination case?

### II.

### Procedural History

The factual background of this case is set out in the Court's Opinion of August 15, 2008. ECF No. 340. The following aspects of the case's procedural history are relevant to the present issue before the Court.

The Court previously determined that "the period of disability attributable to Xerox's actionable conduct in this case, and thus the period of back pay, should be 8 years." *Hylind v. Xerox Corp.*, 749 F. Supp. 2d 340, 346 (D. Md. 2010) *aff'd in part, rev'd in part and remanded*, 481 F. App'x 819 (4th Cir. 2012). Those eight years covered the years 1995 to 2002. The Court further found that "the appropriate base salary for measuring Hylind's back pay should be the average of the salaries she actually received in the four years preceding her discontinuance of work in 1995, with increases to reflect reasonable expected salary increases over the relevant 8-year period." *Id.* at 348. After concluding that disability benefits that Hylind received under Xerox's disability plan ultimately should be considered compensation paid Hylind by Xerox, the Court held that "for each year as to which back pay is awarded, Hylind's award of salary and benefits will be reduced by the amount of disability pay she received in that year." *Id.* at 350. The Court did not offset any disability payments made after the back pay period, because it was only for the 8 year back pay period that the Court "determined Hylind's disability was caused by Xerox's actionable conduct." *Id.* at 351.

Both Hylind and Xerox appealed to the United States Court of Appeals for the Fourth Circuit, which "affirm[ed] the judgment of the district court in each respect, except for its decision to offset Hylind's disability payment from her back pay award." *Hylind v. Xerox Corp.*, 481 F. App'x 819, 825 (4th Cir. 2012). The Fourth Circuit thus vacated the damages award and remanded to this Court in light of the Fourth Circuit's holding in *Sloas v. CSX Transp. Inc.*, 616 F.3d 380 (4th Cir. 2010) "that the mere fact '[t]hat a benefit comes from the defendant . . . does not itself preclude the possibility that it is from a collateral source.'" *Id.* (*quoting Sloas*, 616 F.3d at 389).

2

Once the case returned to this Court, the Court held a teleconference with the parties, set a briefing schedule, and subsequently held a motions hearing to determine, in light of *Sloas*, whether the disability benefits should be set off from the back pay award.

At the hearing, the Court noted the dearth of evidence bearing on the issue before it and asked the parties if they felt that an evidentiary hearing or additional discovery would be appropriate. Oct. 24, 2013 Tr. 41:7-14, 57:3-6.[1] Both Hylind and Xerox declined the opportunity, maintaining that there was sufficient evidence in the record as it stood for the Court to make a decision. *Id.* at 41:17-21, 41:23-43:1, 52:3-11. Even so, Hylind submitted documentation to the Court with her briefing, but it was both then and now unclear to what extent those exhibits had actually been admitted at trial. Accordingly, the Court allowed Xerox to choose to either contest the documents Hylind had submitted as not properly part of the record before the Court, or to accept those submissions and at the same time submit its own documents. *Id.* at 56:2-7, 57:7-13. Following the hearing, Xerox chose to file an affidavit with additional documentation, and the Court permitted Hylind to depose the affiant and submit a written response, which she did.

At the time of the October, 2013 hearing, Xerox represented to the Court that its disability policy was a document entitled "Personnel Manual, Personnel Policy Number 502.1.[2] ECF Nos. 509-1, 521-3 ("Personnel Manual")." The Court noted, however, that the Personnel Manual was not actually a policy, but rather a summary of its contents, and indicated that it wanted to see the actual policy. Tr. 47:1-10. Only after the hearing did Xerox produce the

---

[1] When the Court had occasion to apply the *Allen* test previously, it also observed that "there is no evidence in the record that would permit the Court to balance the test's five factors." *Hylind*, 749 F. Supp. 2d at 349 n.7.
[2] Xerox: "Your Honor, my understanding is that this is, in fact, the policy." The Court: "This is the policy, you say?" Xerox: "Yes." Oct. 24, 2013 Tr. 19:19-22.

3

actual disability plan, a document entitled "Xerox Medical Care and Long Term Disability Income Plan.  ECF No. 521-2 ("Plan")."

As it turns out, Article 7 of the Plan states that the terms and provisions of the Personnel Manual govern long term disability benefits.  Gauger Aff. ¶5 at ECF No. 521-1.  Xerox also filed with the Court a summary of benefits entitled "You and Xerox: Benefits for Salaried Employees".  ECF No. 521-5 ("You and Xerox"); Gauger Aff. ¶9.

The Court has reviewed the material before it.  For the following reasons, it concludes that the disability payments should not have been deducted from the back pay award, and that the total of the disability payments to be added back in should be $34,819.00 per year for 8 years, a total of $278,552.  The total back pay due to Hylind, for the years 1995 to 2002, with the disability payments added back in, thus comes to $1,445,781.[3]  *See* Exhibit A hereto.  Counsel will be directed to submit interest worksheets as described *infra*.

The Court explains.

### III.

### Collateral Source Rule

As a general rule, back pay is to be awarded to successful Title VII plaintiffs.  *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421-22 (1975).  The back pay award is "intended to make the victims of unlawful discrimination whole," restoring them "to a position where they would have been where it not for the unlawful discrimination."  *Id*. at 421.

Certain payments the plaintiff receives from sources collateral to, or independent of, the tortfeasor may not be offset from a back pay award under the collateral source rule.  "The collateral source rule holds that 'compensation from a collateral source should be disregarded in assessing tort damages.'"  *Sloas*, 616 F.3d at 389 (quoting *United States v. Price*, 388 F.2d 448,

---

[3] The total shown on Exhibit A is $1,445,781.25.  That amount will be rounded down to $1,445,781.

449-50 (4th Cir. 1961)).  The rule specifically "bars a tortfeasor from reducing the quantum of damages owed to a plaintiff by the amount of recovery the plaintiff receives from other sources of compensation that are independent of (or collateral to) the tortfeasor."  *Davis v. Odeco, Inc.*, 18 F.3d 1237, 1243 (5th Cir. 1994) (citing *Phillips v. Western Co. of North America*, 953 F.2d 923, 929 (5th Cir. 1992)).

The collateral source rule aims to ensure that tortfeasors bear the costs of their own conduct while "prevent[ing] tortfeasors from paying twice for the same injury—a result that would achieve both overdeterrence and overcompensation."  *Davis*, 18 F.3d at 1244 n. 21.  The rule is also intended to protect plaintiffs who have the "foresight to obtain insurance, particularly where, but for the tortfeasor's actions, that insurance would have continued to be available for other purposes . . . ."  *Phillips*, 953 F.2d at 930.  "If tortfeasors could set off compensation available to plaintiffs through collateral sources, then plaintiffs who pay their own insurance premiums would suffer a net loss because they would derive no benefit from any premiums paid."  *Davis*, 18 F.3d at 1243 n.21.  "[A]llowing the tortfeasor a credit for the plaintiff's insurance detracts from the function of deterrence in tort law . . . ."  *Phillips*, 953 F.2d at 930.  Finally, the rule excluding evidence of collateral benefits also derives from a concern of "jury prejudice": that evidence of collateral benefits may cause the jury to "feel that awarding damages would overcompensate the plaintiff for his injury (even though the defendant would only pay once), and may factor this into the liability calculus."  *Id.*

In *Sloas*, the Fourth Circuit clarified that the mere fact that the source of the benefit was the defendant tortfeasor "does not itself preclude the possibility that it is from a collateral source."  *Sloas*, 616 F.3d at 389 (quoting *Price*, 388 F.2d at 450).  Instead, a plaintiff "may receive benefits from the defendant himself which, because of their nature, are not considered

double compensation for the same injury but are deemed collateral." *Id*. at 390 (quoting *Price*, 388 F.2d at 450). Rather than focus on the source of the benefit, *Sloas* held that the focus of the inquiry should be upon "the exact nature of the compensation received." *Id*. Thus, "[i]f the tortfeasor provides a benefit to the plaintiff 'specifically to compensate him for his injury,' the benefit does not constitute a collateral source." *Id*. (quoting *Price*, 388 F.2d at 449). In contrast, the benefit will be deemed as flowing from a collateral source "unless it results from 'payments made by the employer in order to indemnify itself against liability.'" *Id*. (quoting *Phillips*, 953 F.2d at 932). *Accord Davis*, 18 F.3d at 1244 ("In determining whether a benefit plan that is wholly or partly funded by the tortfeasor is a collateral source, the ultimate inquiry remains whether the tortfeasor established the plan as a prophylactic measure against liability.").

*Phillips*, upon which *Sloas* relies, employed the five-part test articulated in *Allen v. Exxon Shipping Co*, 639 F. Supp. 1545 (D. Me. 1986) to determine whether a disability benefit constitutes a "fringe" or collateral benefit, as opposed to a means of indemnifying the employer against liability (which should, then, be set off against the award). *Phillips*, 953 F.2d at 932. The *Allen* factors are: (1) whether the employee contributed to the benefit plan; (2) whether the benefit plan arose as the result of a collective bargaining agreement; (3) whether the plan covers both work-related and nonwork-related injuries; (4) whether payments from the plan are contingent upon the length of service of the employee; and (5) whether the plan contains any specific language contemplating a set-off of benefits received under the plan against a judgment received in a tort action. *Davis*, 18 F.3d at 1244; *Allen*, 639 F. Supp. at 1547-48. Other courts have applied the *Allen* test in determining whether disability benefits constitute a fringe benefit, which is to say a "collateral" benefit under the collateral source rule. *See, e.g., Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 305 (5th Cir. 2008) (analyzing whether benefits received under an

employer-provided group health insurance plan to cover medical expenses were from a collateral source); *Webber v. Int'l Paper Co.*, 307 F. Supp. 2d 119, 125 (D. Me. 2004) (finding long term disability benefits constituted a collateral source which could not be offset against an award of back pay).

Hylind would have the Court read *Sloas* as creating a "single-factor, legal test" that would only examine whether the disability plan indemnifies the employer against liability for sexual discrimination. Hylind Mem. at 2, ECF No. 513. The Court finds this too narrow a construction. Rather, *Allen* provides a multi-factor framework for determining whether employer-provided disability benefits were "made by the employer in order to indemnify itself against liability", *Phillips*, 953 F.2d at 932, or whether they constitute a fringe, collateral benefit.

The Fourth Circuit's primary concern in this case was that this Court had focused on the source, rather than the nature of the disability payments. On remand, all of the *Allen* factors are in play.

As a preliminary matter, the Court holds that Xerox bears the burden of demonstrating that the collateral source rule does not apply. *Hylind*, 481 F. App'x at 824 (citing *Sloas*, 616 F.3d at 389). *Accord, Promisel v. First Am. Artificial Flowers, Inc.*, 943 F.2d 251, 258 (2d Cir. 1991) (finding employer waived its claim to offset social security and unemployment payments from the damage award when it failed to object at trial); *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 795 (3d Cir. 1985) ("[a]s between the employer, whose action caused the discharge, and the employee, who may have experienced other noncompensable losses, it is fitting that the burden be placed on the employer."). *But see Overton v. United States*, 619 F.2d 1299, 1305-06 (8th Cir. 1980) (plaintiff receiving Medicare benefits must "show he has contributed to the fund he claims as a collateral source" in order to invoke the collateral source rule).

## IV.

### The *Allen* Factors

Here is what the record shows:

### A.

### Did Hylind Contribute to the Benefit Plan?

The fact that the employer rather than the employee contributed to the plan tends to suggest that the payment may not have been from a collateral source, but was meant by the employer to indemnify itself against liability. *See Falconer v. Penn Maritime, Inc.*, 397 F. Supp. 2d 144, 147 (D. Me. 2005) (adding the qualification that "[i]f the employer made the payment because it was obligated to do so, the collateral source rule may apply."). However, as already noted, "the fact that [the disability payment] comes from the defendant tortfeasor does not itself preclude the possibility that it is from a collateral source." *Price*, 288 F.2d at 450. The Court must also look at the nature of the benefits. *Id*.

The Court has previously found that the disability payments received by Hylind came from Xerox. Xerox has now submitted an affidavit from Judy A. Gauger, Disability Manager, Corporate Human Resources for Xerox Corporation, which states that the "disability benefit is fully self-insured and self-funded by Xerox." Gauger Aff. ¶7. According to the affidavit, neither an insurance company nor Hylind contributed to the disability plan. *Id*. Although an insurance company may administer the disability plan, such as determining eligibility for benefits and the steps for processing claims, the cost of the disability benefit was paid for entirely by Xerox. *Id*. at ¶¶8-9. The summary of benefits "You and Xerox" also states that "The Company pays the full cost of providing your disability income." ECF 521-5 at 69. That document also states that for the long term disability income plan, "Xerox pays claims out of general assets", whereas the

medical care portion of the plan is funded "out of general assets; employees make premium contributions through payroll deductions." *Id*. at 155.  Short-term disability benefits consist of full pay for up to five months. *Id*. at 69.  Long term disability benefits can continue after five months, but "[u]nder no circumstances will an employee receive more than 60% of pre-disability pay from Xerox." *Id*. at 70.  Neither the Plan itself nor the Personnel Manual states how the disability benefits are funded.

Hylind argues that the relevant plan is the Xerox Medical Care and Long Term Disability Income Plan which, in addition to providing disability benefits to company employees, includes medical and dental benefits for employees of the company and its subsidiaries and their eligible dependents.  ECF No. 535-1, Section 1.3.  She argues that she contributed to the medical and dental portions of the Plan, and in that way she satisfies the first prong.  Hylind Mem. at 11-12, ECF No. 535.

Hylind further argues that she made contributions to the disability benefit for at least 60 months.  She points to "enrollment worksheets" she says she previously submitted to the Court in connection with one or more of the multifarious pleadings she submitted over the course of this long-running case but which were never offered or admitted into evidence at trial.  ECF No. 535-1; Tr. 47:22-51:23.[4]  The worksheets indicate payments made of $17.60 or $15.22 per pay period towards "Xerox Long-Term Disability", "Option 2-60% of Base Pay".  Gauger stated in her deposition that she did not know whether those amounts were deducted from Hylind's pay to assist with long term disability payments.  ECF No. 535-2 at 62.  She did reiterate, however, that the long term disability plan was a self-funded program without any cost to the employee.  *Id*. at

---

[4] Xerox was given an opportunity to challenge the authenticity of the worksheets when they were first submitted to the Court, and again at the October, 2013 hearing.  In a letter to the Court dated October 24, 2008, Xerox did not challenge the authenticity of the worksheets, but instead argued that they did not show that Hylind contributed to the disability benefit.  ECF No. 351.  Xerox likewise has not challenged their authenticity now.

63. Handwritten dates (it is not clear who wrote these dates in) indicate the worksheets are from 2001 – 2005; the applicable years for this inquiry, however, are 1995-2002.

The Court might well conclude that Hylind did not contribute to the disability benefits based upon the Gauger affidavit and You and Xerox document. But the enrollment worksheets submitted by Hylind do suggest that, at least for the years 2001 and 2002, Hylind may have made some contribution to the benefits, and Gauger stated in her affidavit that she simply did not know if the amounts on the worksheet were deducted from her pay. Since the evidence appears to be in equipoise and, as it is Xerox's burden to show that the plan was entirely self-funded, the Court finds—by a very slim margin—that Xerox has not carried its burden with respect to the first *Allen* factor. The first *Allen* factor favors Hylind.

**B.**

<u>Did the Benefit Plan Arise as the Result of a Collective Bargaining Activity?</u>

If the disability benefit arises as a result of collective bargaining activity, courts have been inclined to declare it a fringe benefit not subject to set-off. The rationale is that "when a[n] employee has bargained for a fringe benefit as additional consideration for employment," the employee is "contractually entitled to the benefit" and would be undercompensated if there was a setoff. *Davis*, 18 F.3d at 1244. Further, if the employer is obligated to provide the benefit to the employee, it is not a voluntary payment made by the employer to indemnify itself against liability. *See Hall v. Minn. Transfer Railway Co.*, 322 F. Supp. 92, 96-97 (D. Minn. 1971) (finding an insurance policy a fringe benefit and in effect part of the employee's income where employer was required by a collective bargaining contract to pay premiums directly to the insurer).

Gauger states that the disability plan was not collectively bargained for, and that Hylind "was not represented by any union during her employment with Xerox." Gauger Aff. at ¶6.[5] In opposition, Hylind has produced a "Form 5500" that Xerox purportedly filed with the IRS and Department of Labor in 1995. ECF No. 535-5. At line 13(a), Xerox indicates that the Medical and Long Term Disability Income Plan is "a plan established or maintained pursuant to one of more collective bargaining agreements". When Gauger was asked if she knew if there was a collective bargaining agreement applicable to Hylind, she responded that it was "irrelevant" because Hylind "is a salaried employee." Gauger Dep. 47:21-24. There is no evidence before the Court, however, that Gauger was confronted with the Form 5500 at her deposition or asked how it might have applied to Hylind, and, indeed, neither party has presented the Court any actual collective bargaining agreement at all, let alone one containing a provision "setting out a 'requirement that the employer pay premiums directly to the insurer, much as an employer might at the direction of his employee deduct money from wages'", *Allen*, 639 F. Supp. at 1548 (quoting *Hall*, 322 F. Supp. at 96).[6]

The evidence as to this *Allen* factor is meagre, to be sure. Gauger says flatly the plan was not collectively bargained for; Hylind has offered an unauthenticated, unexplained document suggesting that Xerox on at least one occasion represented to the Federal Government that at least some part of a Plan presumably extended to some but not necessarily all Xerox employees—which includes medical and dental benefits—was in fact subject to a collective bargaining agreement.

---

[5] Similarly, counsel for Xerox claimed at the motions hearing that the plan "did not arise from a collective bargaining agreement." Tr. 9:18. Counsel argued that there was no reference to a union in the plan itself or in the case. *Id*. at 10:10-14.

[6] The Court notes that Section 7.2 of the Plan states that "the terms and provisions of the applicable collective bargaining agreement shall govern the determination of eligibility for and the amount of long term disability benefits payable under the Plan . . . with respect to all hourly Employees . . . covered by such [CBA]." ECF 521-2 at 36. It may be, for all the Court can surmise, that the Form 5500 refers to a CBA that applied only to hourly employees, but again, evidence such as this is simply not before the Court.

11

Such reliable evidence as there is, however weighs in favor of Xerox. Again, however, this is merely one of the *Allen* factors the Court considers in arriving at the ultimate conclusion. The critical issue remains whether the disability payment was "a mere gratuity" or "an arrangement by which the company has undertaken voluntarily to indemnify itself against possible liabilities to injured employees". *Hall*, 322 F.Supp. at 96.

### C.

### Did the Plan Cover Both Work-related and Nonwork-related Injuries?

Here the parties appear to be in agreement. "[T]he disability plan here in question covers both disability arising from work-related injuries or causes and that which arises from nonwork-related injuries and causes. . . . Both of these factors cut in favor of denying a set-off to the employer." *Allen*, 639 F. Supp. at 1549. Both Xerox and Hylind concede that the plan covers "both non-job and job related disability". Tr. 6:2-3, 10:20-23; Hylind Mem. at 16-17, ECF 535. This is important because if the insurance plan only covers on the job injuries "for which the employer might be liable by statute or common law, it is solely for the benefit of the employer and cannot be characterized as a fringe benefit given employees in consideration for their labors." *Hall*, 322 F. Supp. at 97 (citing *Thomas v. Humble Oil & Refining Co.*, 420 F.2d 793 (4th Cir. 1970)). In contrast, in *Davis*, the Fifth Circuit found that the employer's insurance plan's "*exclusive* application to *nonwork-related* injuries is strong evidence that [the employer] did not establish the Plan to reduce its own legal liability. . . . Rather, it is closely akin to a fringe benefit –part-and-parcel of its employees' compensation package." 18 F.3d at 1245 (original emphasis). Here, the fact that Xerox's disability plan covers "nonwork-related injuries" for which Xerox "would not ordinarily be liable", *id.*, weighs in favor of finding that the disability plan was not created in order to reduce Xerox's liability for injuries to Hylind. *See also Johnson*,

544 F.3d at 306 (finding that although the *Davis* case presented a "close question, and that several *Phillips* factors weighed against collateral source status, . . . [u]nder *Davis*, the plan's exclusive coverage of on-work related injuries is the dispositive factor in determining that the plan is a collateral source.").

This factor tends to favor Hylind's position that the benefits flowed from a collateral source.

**D.**

Are Payments from the Plan Contingent upon the Length of Service of the Employee?

If the benefits are based upon the employee's length of service, it is more likely to be a fringe benefit, which is to say from a collateral source. *Allen*, 639 F. Supp. at 1549. Xerox contends that Hylind was entitled to the benefits of the plan from the first day of work (as were all employees working a minimum number of hours per week), and that therefore the payments are not contingent upon length of service. Tr. 11:4-22. *See also* You and Xerox at 69 ("As a Xerox employee working at least 20 hours per week on a regular basis, you are automatically eligible to participate in the disability plan on your first day of work at Xerox.")

Hylind responds that inasmuch as employees are entitled to a larger disability payment if they have a higher income, the disability payments are therefore contingent upon the length of service.[7] But here, quite clearly, the disability benefits are tied to income, not length of service. The case cited by Hylind does not support her view. *See Webber v. Int'l Paper Co.*, 307 F. Supp. 2d 119, 125 (D. Me. 2004). The Court finds that this *Allen* factor weighs in favor of Xerox.

---

[7] Hylind cites to a single line from You and Xerox at 10 which contains a bullet under the line "Each Time Your Pay Increases", "Your potential for income in case of future disability increases."

13

**E.**

<u>Does the Plan Contain Specific Language Contemplating a Set-off of Benefits Received under the Plan Against a Judgment Recovered in a Tort Action?</u>

If "the plan contains any specific language contemplating a set-off of benefits received under the plan against a judgment recovered in a tort action",[8] *Allen*, 639 F. Supp. at 1548, the suggestion is that a "dominant purpose of the plan is to provide a source of indemnification of the employer against liability for disability arising from personal injury." *Id.* at 1549. *See also Clark v. Burlington N., Inc.*, 726 F.2d 448, 451 (8th Cir. 1984) (finding that language in the employer's policies that expressly contemplated a decrease in disability benefits for money paid under a Federal Employers' Liability Act judgment reflected the employer's "manifest intent" to indemnify itself which "must be respected", making setoff appropriate).

Xerox relies on language in the Personnel Manual, Section III. B. in support of its assertion that a setoff is contemplated, namely that:

> Disability benefits will be reduced by or recovered to the extent of any amounts paid or payable to the employee under . . . any and all amounts received by the employee as compensation for work performed or services rendered.

Personnel Manual, ECF 521-3 at p.5; Tr. 12:20-13:17.  In Gauger's affidavit, Xerox represents that the "You and Xerox" Benefits Manual explains that "the long term disability benefits received are reduced by any other amounts received by the employee." Gauger Aff. at ¶10. However, the Court does not read the cited provision so broadly. What the Benefits Manual actually states, however is that long term disability benefits:

> are reduced by any other disability benefits available to you from any of the following sources:

---

[8] Hylind notes in its supplemental pleading that *Davis* slightly restates the last factor, but the Court notes that the meaning remains the same: "(5) whether the plan contains specific language requiring that benefits received under the plan to be set-off against a judgment adverse to the tortfeasor." *Davis*, 18 F.3d at 1244.

- Workers' compensation
- Occupational disease law
- Statutory disability benefits law (including no-fault auto insurance)
- Other external company-provided disability, or other income benefits
- Primary Social Security benefits.

ECF 521-5 at 70.

Hylind responds that the stated purpose of the Plan is not indemnification. Section 1.3 of the Plan states, "The purpose of the Plan is . . . to provide disability benefits for Employees of the Company." ECF 521-2 at p.6. Gauger testified on deposition that the purpose of the disability plan was to provide a benefit and additional compensation to employees. Gauger Dep. at 41:10-23; 42:6-7. Accordingly, Hylind argues that if the disability benefits constitute "additional compensation," they amount to a fringe benefit, hence are collateral in nature. *See Davis*, 18 F.3d at 1244 ("when the benefit at issue was established and funded by the employer as additional compensation . . . refusing to deduct benefit payments from the plaintiff-employee's damage award does not make the employer pay twice").

The Court finds no "specific language" in the Plan contemplating a setoff of benefits in the event an employee receives a judgment in a tort action for which Xerox might become liable. Nor is there any such language in the Personnel Manual, the terms and conditions of which govern the Plan per Section 7.1 of the Plan. The Personnel Manual contemplates reducing disability benefits for express categories of relief, as indicated *supra*, most of which are payments for which Xerox would not become liable or need to indemnify itself against.[9] ECF No. 521-3 at III.B. While Xerox argues that tort liability falls within the catchall "any and all

---

[9] Consider this language from the *Davis* case:
"As an employer, Murphy Co. would not ordinarily be liable for non-work-related injuries. The Plan therefore applies only under circumstances in which Murphy Co. is unlikely to be found liable for the injuries or illnesses of its employees. Thus, the Plan does not appear to have been devised to reduce Murphy Co.'s legal liability for its employees' maladies. Rather, it is closely akin to a fringe benefit—part-and-parcel of its employees' compensation package." *Davis*, 18 F.3d at 1245.

amounts received by the employee as compensation for work performed or services rendered", the Court still finds that this does not meet the *Allen* requirement of "specific language" of indemnification against a judgment in tort, more particularly one that has been established against Xerox itself. *Allen*, 639 F. Supp. at 1548; *Davis*, 18 F.3d at 1244.

This *Allen* factor favors Hylind.

**F.**

<u>Conclusion as to Nature of the Compensation Received</u>

To repeat: A benefit is "from a collateral source unless it results from 'payments made by the employer in order to indemnify itself against liability.'" *Sloas*, 616 F.3d at 390 (quoting *Phillips*, 953 F.2d at 932). Taking all the foregoing *Allen* factors into account, the Court finds that the disability benefits previously offset from Hylind's back pay award derived from a collateral source.

The factors in favor of finding setoff are that the payments under the Plan were not dependent on the employee's length of service, and that the Plan was not a result of collective bargaining activity.

But the two factors that ultimately persuade the Court that payments under the Plan were a collateral benefit are (1) that the Plan covers non-work as well as work-related injuries, and (2) there is no express language in the policy itself contemplating a setoff of the disability benefits in the case of tort liability against Xerox. As in *Davis*, the fact that the plan covers disabilities for which Xerox "is unlikely to be found liable", 18 F.3d at 1245, suggests that the plan was not created to reduce its liability. On balance, Xerox has not persuaded the Court that the Plan is anything other than "a fringe benefit—part-and-parcel of its employees' compensation package." *Id*.

**V.**

Calculating the Back Pay Award

Hylind is therefore entitled to a back pay award as calculated in the Court's September 17, 2010 Opinion, the sole difference being that the disability benefits will not offset the award. The Court awarded back pay from 1995 to 2002. *Hylind*, 749 F. Supp. 2d at 347 & n.3. It did so by calculating as Hylind's base salary, the average of the salaries she actually received in the preceding four years, allowing increases to reflect reasonably expected salary increases and to account for inflation and wage growth. *Id*. at 348. The Court also added a percentage to reflect lost benefits, representing employer contributions to Hylind's 401(k) and cash balance retirement account. In its prior Opinion, the Court deducted her disability pay of $34,819 per year before adding pre-judgment interest to the balance of each year of 6%, compounded annually through the date of judgment. *Id*. at 351-52. All these findings were affirmed by the Fourth Circuit. Having now found that Xerox is not entitled to a setoff for the disability payments, the Court re-calculates Hylind's back pay award as follows:[10]

| Year | Base Salary (Adjusted 3% Annually) (1) | Compensation (Base Salary + 8% Benefits) (2) | + Pre-Judgment Interest: 6% Compounded Annually Through Judgment (Sept. 2010) (3) | TOTAL (2) + (3) |
|---|---|---|---|---|
| 1995 | $77,037 | $83,200 | $116,195 | $199,395 |
| 1996 | $79,349 | $85,696 | $108,055 | $193,751 |
| 1997 | $81,729 | $88,267 | $100,001 | $188,268 |
| 1998 | $84,181 | $90,915 | $92,025 | $182,940 |
| 1999 | $86,706 | $93,643 | $84,119 | $177,762 |
| 2000 | $89,308 | $96,452 | $76,279 | $172,731 |
| 2001 | $91,987 | $99,346 | $68,496 | $167,842 |
| 2002 | $94,746 | $102,326 | $60,766 | $163,092 |
| Total | | | | **$1,445,781** |

---

[10] For a more detailed presentation of the Court's back pay award calculation, see attached Exhibit A, Detailed Back Pay Award Calculation.

The Court, therefore, awards Hylind $1,445,781 in back pay and will enter judgment in that amount in her favor as to her economic damages.

Hylind, moreover, is entitled to simple post-judgment interest at the federal legal rate from the date of judgment until paid.  *See* 28 U.S.C. § 1961; *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990) ("postjudgment interest properly runs from the date of the entry of judgment").  "Interest shall be computed daily to the date of payment . . . and shall be compounded annually." 28 U.S.C. § 1961(b).

Since judgment was entered on the back pay award on September 17, 2010, it is from that date that the federal post-judgment rate of interest must run.  In order to calculate the federal legal rate of interest, the Court determines the "weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding [.] the date of the judgment." § 1961(a).  The Court finds that that rate was 0.26%.[11]  Counsel are directed to promptly submit worksheets to the Court, setting forth what the total of principal ($1,445,781) plus interest (0.26%) would be from September 17, 2010 through July 31, 2014.

## VI.

Conclusion

The Court **AWARDS** Hylind disability payments for the years 1995 to 2002 in the total amount of $1,445,781 in back pay, plus post-judgment interest at the federal legal rate of interest as described herein.

---

[11] *Available at* http://www.federalreserve.gov/releases/h15/20100920/h15.pdf.

A separate Interim Order will **ISSUE**.  A Final Order of Judgment will be entered at such time as the Court receives and decides the appropriate post-judgment interest due.

**July 9, 2014**

/s/_____
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**